**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**                                                    **1:15-cr-351-WSD**

**MIMS MORRIS and JOHNATHAN**
**SILVERS a/k/a Turtle,**

**Defendants.**

## OPINION AND ORDER

This matter is before the Court on Magistrate Judge Justin S. Anand's

Report and Recommendation [168] ("R&R").  The R&R recommends the Court

deny Defendants Mims Morris and Johnathan Silvers's Motions to Suppress

Intercepted Communications [121], [142], [150], [154], [157] ("Motions to

Suppress").  Also before the Court are Defendant Morris's Objections to the R&R

[170] and Defendant Silvers's Objections to the R&R [171].

## I.   BACKGROUND

A.   Facts[1]

On August 5, 2014, Assistant United States Attorney Brent Alan Gray submitted, and United States District Judge Amy Totenberg authorized, an application for interception of wire and electronic communications on a cellular phone associated with Defendant Morris for a period of thirty days.  (See Application [142.1] ("App."); Order [142.3]).  The Application was supported by an Affidavit executed by Special Agent James Hosty of the Federal Bureau of Investigation ("FBI").  (See Affidavit [142.2] ("Aff.")).

The Application states:

> Pursuant to 18 U.S.C. § 2516, the Attorney General of the United
> States has specially designed the Assistant Attorney General in charge
> of the Criminal Division and any Deputy Assistant Attorney General
> of the Criminal Division to exercise the power conferred on the
> Attorney General by 18 U.S.C. § 2516, to authorize this Application.
> Under the power designated to him or her by special designation of
> the Attorney General pursuant to Order Number 3055-2009 (executed
> on February 26, 2009), Acting Deputy Assistant Attorney General
> David A. O'Neil, an appropriate official of the Criminal Division, has
> authorized this Application.  See Attachment A.  **Attached to this
> Application are copies of the Attorney General's Order of Special**

---

[1]   The facts are taken from the R&R and the record.   The parties have not objected to any specific facts in the R&R, and the Court finds no plain error in them.  The Court thus adopts the facts set out in the R&R.  See Garvey v. Vaughn, 993 F.2d 776, 779 n.9 (11th Cir.  1993).

2

**Designation and the Memorandum of Authorization approving this Application authorizing the interception of wire and electronic communications**.  See  id.

(App. ¶ 6 (emphasis added)).  Attachment A to the Application included a memorandum approving the wiretap application, signed by David A. O'Neil, Acting Deputy General, Criminal Division.  (See App. at 22).  The memorandum included an additional signature line for Leslie R. Caldwell, Assistant Attorney General, Criminal Division, which was left unsigned.  (Id.).  The Government concedes that Attachment A did not include the Attorney General's order of special designation.  (See Gov't Br. [160] at 17 n.7).

According to the Affidavit, Defendant Morris and other state prisoners—including Adam Smith, a codefendant of Defendants Morris and Silvers—are members of the Ghostface Gang, who arrange for cellular telephones to be illegally smuggled into state prisons and then use those phones to engage in drug trafficking and fraud schemes.  (See Aff. ¶¶ 10, 22-28).  The FBI's information in part came from two Confidential Human Sources ("CHS"):  CHS1 (an individual located outside of the prison who was in contact with Defendants Morris and Smith) and CHS2 (a fellow prisoner at Phillips State Prison).  Smith generally bragged to CHS1 that gang members obtain phones and other contraband through corrupt prison employees, and then use the cellular phones to commit other crimes both

inside and outside the prison. (Id. ¶¶ 29-30). Such crimes include drug trafficking and wire fraud against victims outside of the prisons. (Id.).

In May 2014, Smith asked CHS1 to participate in a wire fraud scam, which required "people on the street" to "wash the money." (Id. ¶ 31). Specifically, Smith asked CHS1 to purchase pre-paid debit cards, which would then be loaded with money obtained from "scamming" people. (Id.). CHS1 would then be asked to withdraw the money from the card, purchase a new card, to send back to the inmates. (Id. ¶¶ 25, 31).

At one point, CHS1 was approached by Defendants Morris and Smith to purchase methamphetamine, which would be smuggled into the prison by a prison employee. (Id. ¶ 39). The affidavit details certain other conversations among Morris, Smith and CHS1 about CHS1's assistance in arranging for drug transactions and bribery transactions with specific corrections department employees. (See id. ¶¶ 41-54).

The affidavit also included information from CHS2, who, as a fellow inmate with Morris and Smith, was able to supply or corroborate important information, including as to Morris's new telephone numbers. (See, e.g., id. ¶ 64). CHS2 also provided information, including about Morris's efforts to purchase and import

4

drugs, which included asking for CHS2's assistance in locating sources of supply. (<u>See, e.g.</u>, <u>id.</u> ¶ 68).

In explaining the necessity of a wiretap, the Affidavit outlined the reasons why other investigative steps, including ongoing use of CHS1 and CHS2, would not be sufficient.  (<u>See id.</u> ¶¶ 81-129).  In their Motions to Suppress, Defendants challenge only the assertions in the affidavit regarding the limitations of using CHS1 and CHS2.

According to the affidavit, "[a]lthough the information and evidence CHS1 and CHS2 have provided has been helpful to date, they are constrained by certain significant limitations, and those limitations will hinder the accomplishment of the INVESTIGATORY GOALS."  (<u>Id.</u> ¶ 89).  Specifically, CHS1 does not have "regular in-person contact" with Morris, only communicates with him by phone, and "does not communicate with anyone else [other than Morris or Smith] in the organization on a personal basis."  (<u>Id.</u> ¶ 90).  Morris is particularly guarded in his conversations and shares "minimal" information with CHS1; while Smith provides more information to CHS1, that information is also "limited."  (<u>Id.</u>).  Both Morris and Smith owed CHS1 money at the time of the application, and they were "somewhat reluctant to use him/her in new operations because of the debt."  (<u>Id.</u>)

On July 24, 2014, Smith also told CHS1 that he—that is, Smith—was no longer dealing with Morris because of a dispute over money.  (Id. ¶ 91).  Smith instructed CHS1 not to speak with Morris any more.  (Id.).  According to the affidavit, "CHS1 is not currently in position to call TARGET TELEPHONE 1 and/or MORRIS because the only way for CHS1 to get MORRIS' telephone number is through SMITH."  (Id.).

The Affidavit states that CHS2 is not a Ghostface Gang member, and is not directly involved with Morris's and Smith's illegal dealings with corrupt prison employees and most other illegal activities.  (Id. ¶¶ 92, 93).  The agent concluded that it would be highly unlikely that CHS2 would ever become a trusted member of the organization such that he/she would learn more than a "narrow insight of the inner-workings of [the gang] and certainly would not result in the accomplishment of the INVESTIGATORY GOALS."  (Id. ¶ 95).  The agent concluded that neither source would be in a position to get into direct contact with all of Morris's or the other gang members' suppliers, distributors or couriers or the corrupt prison employees who facilitate the crimes.  (Id. ¶¶ 95-96).

B.    Procedural History

Defendants filed their Motions to Suppress between February 24, 2016, and May 23, 2016.  In them, Defendants argued that the Application and Order

6

authorizing wiretapping were invalid because they did not comply with the requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510-2522.  They argued that the Application and Order were invalid, including because (i) the Government did not provide evidence that Acting Deputy Assistant Attorney General O'Neil was specially designated by the Attorney General; (ii) the Government failed to include in Attachment A the Attorney General's Order of Special Designation; and (iii) Leslie R. Caldwell, Assistant Attorney General, Criminal Division, did not sign the memorandum approving the wiretap application.  Defendants also argued that the Application and Affidavit did not establish that the wiretap was necessary, as required under Title III.  They contend the investigation could have continued to rely on CHS1 and CHS2, instead of seeking an interception order.

On July 15, 2016, the Magistrate Judge issued his R&R.  In it, he noted that it does not appear Defendants have standing to suppress evidence gathered under Title III.  He found it unnecessary, however, to reach this question of first impression, because he concluded that Defendants "do not even arguably demonstrate violations of Title III's procedural requirements."  (R&R at 10-11).  The Magistrate Judge found that, under the plain language of Title III, the Government was not required to include the information Defendants contend

render the wiretap warrant invalid.  The Magistrate Judge also found Defendants'
necessity argument "meritless," determining that "the information supplied in the
affidavit provided quintessential grounds for the necessity of a wiretap order."
(R&R at 17, 18).

On July 26, 2016, Defendant Morris filed his Objections to the R&R.  In his
Objections, Morris argues that "the mere fact that the application names an official
in the criminal division satisfies the statutory mandate absent any documentation or
proof . . . is an erosion of Congressional intent and the Fourth Amendment
protections which the Crime Control Act meant to stop."  (Morris Obj. at 6).  He
argues that the Government relies on two documents, a memorandum and a letter,
which were "initiated by one official but signed by another official" but that
"nowhere in the application or in these documents is there any documentation to
prove that they are individuals specifically designated by the Attorney General."
(Id.).  He argues that "a mere claim" to be appropriately designated "does not
satisfy the statutory mandate."  (Id.).

On July 28, 2016, Defendant Silvers filed his Objections to the R&R.  In
them, he reiterates his argument that "the government failed to fully utilize its
confidential sources and, therefore, the order authorizing the interception of wire

communications was granted on an affidavit that failed to demonstrate that normal

investigative procedures had been tried and failed . . . ."  (Silvers Obj. at 2).

## II.   ANALYSIS

### A.   Legal Standard

After conducting a careful and complete review of the findings and

recommendations, a district judge may accept, reject, or modify a magistrate

judge's report and recommendation.  28 U.S.C. § 636(b)(1); Williams

v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A district judge

"shall make a de novo determination of those portions of the report or specified

proposed findings or recommendations to which objection is made."  28 U.S.C.

§ 636(b)(1).  Where no party has objected to the report and recommendation, a

court conducts only a plain error review of the record.  United States v. Slay, 714

F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

### B.   Discussion

#### 1.   Standing

In his R&R, the Magistrate Judge noted, without finding, that Defendants do

not appear to have standing to suppress evidence gathered under Title III.

Standing to challenge the interception of a communication under Title III requires

a defendant to show he is an "aggrieved person," which is defined in the statute as

a "person who was a party to an intercepted . . . communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11).

As the Magistrate Judge noted, the Government concedes Morris meets the definition of "aggrieved person," because he was specifically named as a target of the wiretap order.  The Government also acknowledges that Silvers at least arguably qualifies as an aggrieved person, because he was a party to communications intercepted pursuant to the wiretap order.

The Government argues, however, that Defendants' Motions to Suppress should be denied because, despite meeting the statutory definition of aggrieved person, Defendants lack any Fourth Amendment privacy interest in their communications over illegal cellular telephones while in prison.  Courts have interpreted "aggrieved person" "in accordance with existing standing rules to include those individuals who are the 'victims of . . . invasions of privacy.'" United States v. Dooley, No. 1:11-CR-255-3-TWT, 2013 WL 2548969, at *17 n.37 (N.D. Ga. June 10, 2013) (brackets omitted) (citing Jones v. United States, 362 U.S. 257, 261 (1960), overruled on other grounds by United States v. Salvucci, 448 U.S. 83 (1980); United States v. Ortega-Estrada, No. 1:07-CR-356-TWT, 2008 WL 4716949, at *2 (N.D. Ga. June 10, 2013)); see also Alderman v. United States, 394 U.S. 165, 174-75 & n.9 (1969) ("[Title III's] legislative history indicates that

'aggrieved person,' the limiting phrase currently found in Fed. Rule Crim. Proc. 41(e), should be construed in accordance with existent standing rules." [2]); United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991) (Section 2518(10)(a) "is to be construed in accordance with standing requirements usually applied to suppression claims under the fourth amendment").[3]

Pursuant to this interpretation of the statute, the Court turns to the standing requirements for suppressing evidence under the Fourth Amendment.  It is well established that, in order for a defendant to move to suppress evidence, he must have standing.  United States v. Eyster, 948 F.2d 1196, 1208-1209 (11th Cir. 1991).  A defendant has the burden of showing standing under the Fourth

---

[2]    As the Magistrate Judge noted, this observation by the United States Supreme Court appears to be *dicta*.  (R&R at 9).

[3]    This view is supported by the legislative history of Title III, which provides:
    Title III has as its dual purpose (1) *protecting the privacy of wire and oral communications*, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized.  *To assure the privacy of oral and wire communications*, Title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers . . . .

S. Rep. 90-1097, 1968 U.S.C.C.A.N. 2112, 2224-27 (emphasis added); see also United States v. Garibay, No. 13CR4514-BEN, 2015 WL 468404, at *2 (S.D. Cal. Feb. 3, 2015) ("Title III was enacted in 1968, before the invention of the cellular telephone.  It was enacted to protect the Fourth Amendment right to privacy for telephone conversations . . . .").

Amendment.  United States v. Brazel, 102 F.3d 1120, 1147 (11th Cir. 1997).  To

claim the protection of the Fourth Amendment, an individual must have a

"reasonable expectation of privacy in the invaded place."  Rakas v. Illinois, 439

U.S. 128, 143 (1978).  A defendant's expectation of privacy must be "personal[]"

and "reasonable," and it must have "a source outside of the Fourth Amendment,

either by reference to concepts of real or personal property law or to

understandings that are recognized and permitted by society."  Minnesota

v. Carter, 525 U.S. 83, 88 (1998) (internal quotation marks omitted).

> In Hudson v. Palmer,  the United States Supreme Court held:
>
> [S]ociety is not prepared to recognize as legitimate any subjective
> expectation of privacy that a prisoner might have in his prison cell and
> that, accordingly, the Fourth Amendment proscription against
> unreasonable searches does not apply within the confines of the prison
> cell.  The recognition of privacy rights for prisoners in their individual
> cells simply cannot be reconciled with the concept of incarceration
> and the needs and objectives of penal institutions.

468 U.S. 517, 525-26 (1984).  The Court is aware of only one federal decision

addressing whether this principle applies to bar standing for a prisoner seeking to

suppress the fruits of a wiretap under Title III.  In United States v. Garibay, No.

13CR4514-BEN, 2015 WL 468404, at *2 (S.D. Cal. Feb. 3, 2015), the court

concluded that Title III implicitly excepts law enforcement officers from the need

to obtain a wiretap order before intercepting or recording an inmate's contraband

cell phone communications.  In reaching this conclusion, the <u>Garibay</u> court noted that, in 2010, Congress defined a mobile phone as contraband for federal prisoners.  <u>See</u> Cell Phone Contraband Act of 2010, P.L. 111-225, August 10, 2010 (amending 18 U.S.C. § 1791).  In passing the Cell Phone Contraband Act, Congress made clear that it "considered it dangerous for an inmate to possess a cellular telephone."  <u>Garibay</u>, 2015 WL 468404, at \*3.  The court explained:

> It would be an ironic interpretation of the law to find that a prison inmate, who by virtue of his initial crime and conviction, when he is placed in a cellblock where he has *no* Fourth Amendment rights, and when he commits a further crime by obtaining and using a contraband cellular telephone, acquires a statutory right under Title III to be free from law enforcement eavesdropping, unless a Title III wiretap order is first obtained.  An inmate's argument would have to be that, even if he does not hold a constitutional right to privacy for his contraband telephone communications, he enjoys a statutory right to suppression under Title III.  His implicit argument maintains that he has a statutory right to illicitly use a contraband cellular phone to communicate with others about a criminal conspiracy, and he enjoys protection from those communications being recorded and admitted against him in court, unless a valid wiretap order was in place. This cannot be what Congress intended.

<u>Id.</u> at \*4 (emphasis in original, footnote omitted).  The Court agrees, and adopts the <u>Garibay</u> court's reasoning and its conclusion that "[i]t must be the case that Congress intended to except from the purview of Title III's law enforcement restrictions, the interception of contraband cellular telephone communications from or to an inmate within a jail or prison."   2015 WL 468404, at \*4.  Defendants'

Motions to Suppress are denied because Defendants lack standing.  Even if Defendants had standing to seek suppression of the fruits of the wiretap, the Court agrees with the Magistrate Judge that "Defendants do not even arguably demonstrate violations of Title III's procedural requirements."  (R&R at 10-11).

### 2. Department of Justice Approval

The Magistrate Judge found that, under the plain language of Title III, the Government was not required to include the information Defendants contend render the wiretap warrant invalid.  The statute provides:

> The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation . . . .

18 U.S.C. § 2516(1).

The statute requires that the application state, among other things, "the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application," and that the order shall specify, among other things, "the identity of the agency authorized to intercept the

14

communications, and of the person authorizing the application . . . ."  18 U.S.C.

§§ 2518(1)(a) & (4)(d).

The Application identifies Brent Alan Gray, Assistant United States

Attorney, as the individual making the application.  (App. at 1, 17, ¶ 1).  Paragraph

Six of the Application states:  ". . . Acting Deputy Assistant Attorney General

David A. O'Neil, an appropriate official of the Criminal Division, has authorized

this Application."  (Id. ¶ 6).  The Order identifies the "appropriate official of the

Criminal Division, United States Department of Justice" as "Acting Deputy

Assistant Attorney General David A. O'Neil."  (Order ¶ 6A).  It identifies the

Federal Bureau of Investigation as the agency authorized to intercept the

communications.  (See id.).  Thus, all requirements of Sections 2518(1)(a) and

(4)(d) are satisfied.

Defendants argue that, because the Attorney General's special designation

order was not included with the Application, "the Government provides no

foundation to support its assertion that Mr. O'Neil was ***specially*** designated."

([166] at 5 (emphasis in original)).  In Morris's Objections, he argues that,

"[a]bsent the presence of this order one can only guess who are the individuals

designated to approve wire tap applications."  (Morris Obj. at 5-6).  The Court

conducts its *de novo* review of whether the absence of the Attorney General's special designation order is grounds for suppression.

Morris argues that, in United States v. Lomeli, 676 F.3d 734, 739-40 (8th Cir. 2012), the Eighth Circuit "held that merely disclosing the name and title of the officer authorizing the application is meaningless boilerplate language, unless the explanatory document . . . is actually attached." (Morris Obj. at 6). This interpretation misstates Lomeli. As the Magistrate Judge noted, the problem in Lomeli was that the application failed to name any specific authorizing officer at all, which was in violation of the plain language of the statute. Id. at 739. In Lomeli, the court examined the United States Supreme Court's decision in United States v. Chavez, 416 U.S. 562 (1974). The Lomeli court explained:

> In Chavez, the Court held that suppression was not necessary where the Attorney General had actually authorized the challenged wiretap but the application incorrectly identified the Assistant Attorney General (a potential, statutorily designated official that *could* have been designated by the Attorney General) as the authorizing official.

Lomeli, 676 F.3d at 740 (citing Chavez, 416 U.S. at 568-69). The Chavez court "acknowledged the 'facial sufficiency' of the wiretap application because it clearly identified on its face the name of the authorizing Assistant Attorney General." Id. (citing Chavez, 416 U.S. at 573-74). "Stated differently, the application in Chavez stated that a specifically named, statutorily designated official actually gave the

16

authorization."  Id.  The Lomeli court distinguished Chavez, noting that "[t]he

critical difference is . . . that in Chavez, the face of the application included the

name of the *specific* individual that had purportedly authorized the application

whereas the application in this case just states generically that 'an appropriate

official of the Criminal Division' had authorized the application."  Id. (emphasis in

original).

Here, as in Chavez, the face of the Application included the name of the

*specific* individual that had purportedly authorized the Application.  That the

application referred to the Attorney General's special designation order as being

attached—when it was not—is irrelevant to whether the requirements of Title III

were met, because the special designation order was not, under the statute, required

to be attached.  As the Eleventh Circuit, in an unpublished opinion, recently

observed:  "while the statute requires that the application itself include the identity

of the authorizing official, the statute does not require that the application be

accompanied by documentation substantiating that identification."  See United

States v. Holden, 604 F. App'x 744, 749 (11th Cir. 2015) (citing United States

v. Lyons, 740 F.3d 702, 722-23 & n.6 (1st Cir. 2014) ("The distinction between the

identity of the authorizing official, which must be present on the face of the

application, and proof of authorization, which need not be included, is critical.")).[4]

Defendant Morris's Objections are overruled.

        3.    <u>Necessity</u>

      Congress requires an application for interception to contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  "The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed."  <u>United States v. Van Horn</u>, 789 F.2d 1492, 1496 (11th Cir. 1986).  "The affidavit in support of a search warrant must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.  However, a comprehensive exhausting of all possible investigative techniques is not necessary before applying for a wiretap."  <u>United States v. De La Cruz Suarez</u>, 601 F.3d 1202, 1214 (11th Cir. 2010) (internal quotation marks and citation omitted).

---

[4]    The Magistrate Judge also found that the additional unused signature blocks in the Application "does not in itself show that Mr. O'Neil lacked authority to approve" the Application.  (R&R at 15).  The Court agrees.

Wiretap affidavits are evaluated in a "common sense fashion," and "the determination of when the Government has satisfied [the statutory] requirement must be made against flexible standards, and . . . each case must be examined on its own facts." United States v. Hyde, 574 F.2d 856, 867 (5th Cir. 1978).[5]  Most importantly, Defendants must overcome the presumption of validity that attaches to the District Judge's issuance of the interception orders, which necessarily included a finding that the necessity requirement has been met.  United States v. Mitchell, 274 F.3d 1307, 1310 (10th Cir. 2001).  In other words, the issuing judge enjoys "broad discretion" in considering the application, United States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984), which cannot be overturned unless "clearly erroneous."  United States v. Weber, 808 F.2d 1422, 1424 (11th Cir. 1987).

Defendant Silvers argues that "the government failed to fully utilize its confidential sources and, therefore, the order authorizing the interception of wire communications was granted on an affidavit that failed to demonstrate that normal investigative procedures had been tried and failed . . . ."  (Silvers Obj. at 2).  The

---

[5]     In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Court conducts its *de novo* review as to whether the Government met the necessity

requirement of Title III.

The Magistrate Judge concluded that the Affidavit established that the

investigation:

> went beyond Defendants Morris and Smith—the individuals that CHS
> 1 communicated with.  Nothing about CHS 1 or CHS 2's information
> suggested that they were or could get in a position to directly
> communicate with all of Morris and Silvers' co-conspirators,
> including their sources of supply for drugs and contraband, the outside
> Green Dot card launderers, and the corrupt prison guards being
> bribed.

(R&R at 17).  Silvers argues that the R&R ignores several misstatements in the

Affidavit that undercut the R&R's conclusion.  He argues that the Affidavit was

inaccurate in stating that CHS1 could not call Target Telephone 1 and/or Morris

because CHS1 needed to get Morris's telephone number through codefendant

Smith.  Silvers argues CHS1 was aware of Morris's telephone number.  (Silvers

Obj. at 2).  He argues that the Affidavit's "indication that a 'dispute' between

Messrs. Smith and Morris made it unknown if CHS 1 would ever be allowed to

deal with Mr. Morris again was misleading," (id. at 3), because "the government

didn't believe that the falling out over money was real; it believed the story was

orchestrated by Messrs. Smith and Morris as an excuse not to repay monies owed

to CHS 1[,]" (id.).  Silvers concludes that "CHS 1 could have been of continuing

value to the Government but was, for unknown reasons, not fully utilized." (<u>Id.</u>). Silvers argues CHS2 "demonstrated knowledge of corrupt [prison] officers as well as Mr. Morris' source of supply." (<u>Id.</u> at 4).

Defendant Silvers's arguments ignore other statements in the Affidavit that clearly establish the necessity of the wiretap. For instance, the Affidavit states that CHS1 does not have "regular in-person contact" with Morris, only communicates with him by phone, and "does not communicate with anyone else [other than Morris or Smith] in the organization on a personal basis." (Aff. ¶ 90). Morris is particularly guarded and shares "minimal" information with CHS1; while Smith provides more information to CHS1, that information is also "limited." (<u>Id.</u>). As to CHS2, the Affidavit stated (i) CHS2 was not directly involved with Morris's and Smith's illegal dealings; and (ii) it would be highly unlikely CHS2 would ever become a trusted member such that he/she would learn more than a "narrow insight of the inner-workings of [the gang] and certainly would not result in the accomplishment of the INVESTIGATORY GOALS." (<u>Id.</u> ¶¶ 92, 93, 95). The Affidavit noted that neither CHS1 nor CHS2 would be in a position to have direct contact with the gang members' suppliers, distributors, couriers, or the corrupt prison guards being bribed. (<u>Id.</u> ¶¶ 95-96). The Affidavit noted that, while

> CHS2 has been able to identify corrupt [prison] employees, [he] does
> not have direct contact with them . . . [and he] would not be in

> position to report real-time information regarding bribe payments, the
> agreement between the [prison] employee and the inmate, individuals
> who are supplying the contraband to the [prison] employee on the
> outside of the prison, and other individuals assisting the [prison]
> employee in smuggling in the contraband.

(Aff. ¶ 93).

The Court agrees with the Magistrate Judge that "the information supplied in the affidavit provided quintessential grounds for the necessity of a wiretap order." (R&R at 18). The Affidavit adequately shows the necessity of the wiretap order, and, at a minimum, there is no basis in the record to second-guess Judge Totenberg's decision that the facts stated in the affidavit adequately established necessity. See Mitchell, 274 F.3d at 1310. Defendant Silvers's Objections are overruled.[6]

---

[6]    The Magistrate Judge also addressed Defendants' additional arguments, including that the discs Defendant Morris received in discovery include recorded calls as early as June and July 2014, which preceded the time period authorized by Judge Totenberg's August 5, 2014, interception order. (R&R at 19). The Government represented that these pre-August 5th recordings were consensually-recorded calls, not intercepted calls. (Id. at 20). Defendants did not respond to this argument, and the Magistrate Judge found Defendant Morris's timing argument to be moot. (Id.). The Magistrate Judge also declined to address new arguments first raised in Morris's reply brief. (Id. at 20-21). No party objects to these findings and recommendation, and the Court finds no plain error in them. See Slay, 714 F.2d at 1095.

22

Having found the wiretap order was properly issued, Defendants' Motions to Suppress are denied for this additional reason.

## III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Mims Morris's Objections to the R&R [170] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendant Johnathan Silvers's Objections to the R&R [171] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Magistrate Judge Justin S. Anand's Report and Recommendation [168] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Defendants Morris and Silvers's Motions to Suppress Intercepted Communications [121], [142], [150], [154], [157] are **DENIED**.

**SO ORDERED** this 15th day of August, 2016.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE